[Cite as *State v. Hadlock*, 2021-Ohio-3176.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

SHAWN MATTHEW HADLOCK,

        Defendant-Appellant.

CASE NO. 2020-A-0054

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00129

**O P I N I O N**

Decided: September 13, 2021
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Stephen J. Futterer*, Willoughby Professional Building, 38052 Euclid Avenue, #105, Willoughby, OH 44094 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Shane Matthew Hadlock, appeals from the judgment of conviction, entered by the Ashtabula County Court of Common Pleas, after trial by jury, on one count of felonious assault. We affirm.

{¶2} On January 4, 2020, Christopher Thompson was at the apartment of a friend, William Reen, with another friend, Laura Whitaker. Mr. Thompson was sitting in a chair close to Ms. Whitaker as she shared photos with him on her phone. Suddenly, appellant entered the apartment, advanced on Mr. Thompson and struck him on the right

side of his upper face near the eye socket. He lost consciousness briefly and, upon regaining awareness, he accused appellant of sucker punching him. This prompted appellant to challenge Mr. Thompson to go outside and fight further. Ms. Whitaker stepped in and asked appellant to stop. He pushed her aside and left the apartment. Ms. Whitaker and appellant had been in a long-term relationship and had a child together. Prior to the assault, Mr. Thompson and appellant were friends. Mr. Thompson, however, was under the impression that Ms. Whitaker and appellant were broken up and had recently asked her out. Appellant was aware of this and, as a result, Mr. Thompson opined jealousy was the reason for appellant's actions.

{¶3} Once appellant departed, Mr. Thompson went into the bathroom of the apartment and noticed he was cut near his eye, and his face, where the punch struck, looked "flattened a little bit. It looked like it was broken." He drove himself to the hospital where he received four stitches to mend a cut under his eye. Later, he received a CAT scan and medical personnel advised him aspects of his nose and right eye socket were broken. Surgery was required to repair his injuries. During the period leading up to the surgery, Mr. Thompson maintained he was physically disfigured; to wit, his eye began to droop and his face was flattened. During the surgery, he stated a metal plate was installed to fix the damage. Due to these events, Mr. Thompson asserted he now has a permanent scar under his eye.

{¶4} Appellant was subsequently indicted on one count of felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1). He entered a plea of not guilty. The matter proceeded to jury trial, after which, appellant was found guilty. Appellant was sentenced to serve a minimum term of seven years and a maximum of 10 and one-half years imprisonment. This appeal follows.

2

{¶5}　Appellant's first assignment of error provides:

{¶6}　"The trial court committed prejudicial error by overruling defendant-appellant's motion for judgment of acquittal and entering judgment against defendant-appellant finding him guilty of felonious assault upon the jury verdict, where the evidence at trial was insufficient to prove each and every element of the offense beyond a reasonable doubt."

{¶7}　A challenge to the sufficiency of the evidence concerns the state's burden of production and tests whether the prosecution presented adequate evidence to submit the matter to the fact finder. *See, e.g., State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring). When reviewing the sufficiency of evidence, "courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Id.* "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. (Superseded by statute on other grounds).

{¶8}　Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(1), which provides: "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn[.]"

{¶9}　Appellant first argues the state failed to offer sufficient evidence Mr. Thompson suffered serious physical harm as a result of the assault. He acknowledges Mr. Thompson testified that, after the incident: he required stiches and his facial bones were flattened; that he required surgery to correct the damage; and, due to the injury and the surgery, he had a permanent scar and a plate was installed in his head. Appellant

3

asserts, however, this was insufficient to establish the requisite proof because no medical testimony was offered to substantiate the post-emergency-room treatment Mr. Thompson received. We do not agree.

{¶10} Appellant did not refute Mr. Thompson's testimony regarding his injuries. Moreover, the state offered medical testimony of the emergency room physician that treated Mr. Thompson upon his arrival at the hospital. Dr. Imraan Haniff testified he examined appellant and noted a laceration on the right aspect of his face, which he sutured. The doctor then ordered a CT scan which showed "a comminuted and depressed displaced fracture of the right orbit and maxillary sinus. There is a fracture of the right lateral and inferior walls of the orbit, right zygomatic arch, anterior and lateral walls of the right maxillary sinus, associated soft tissue swelling and subcutaneous gas overlying the right facial region." Dr. Haniff confirmed, in layman's terms, Mr. Thompson had a "fractured face." Mr. Thompson additionally testified that, in the several months leading up to his surgery, he could not sleep on the right side of his head due to the discomfort of the injury.

{¶11} R.C. 2901.01(A) defines "serious physical harm" and provides, in relevant part: "'Serious physical harm means' any of the following: * * * [a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity * * * [or] [a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement." R.C. 2901.01(A)(5)(c) and (d).

{¶12} Here, the reasonable inference could be drawn that Mr. Thompson's testimony that he was incapable of sleeping on his right side due to the pain and discomfort is sufficient to establish "temporary, substantial incapacity." Moreover, the

4

scarring and the insertion of the metal plate in Mr. Thompson's head could be deemed reasonably sufficient to establish "permanent disfigurement." And Mr. Thompson's testimony that the afflicted area, prior to surgery, was flattened, could be reasonably viewed as a form of temporary, serious disfigurement. We therefore hold the state produced sufficient evidence to establish Mr. Thompson sustained serious physical harm as a matter of law.

{¶13} Next, appellant asserts the state failed to produce sufficient evidence that appellant acted "knowingly" to cause serious physical harm to Mr. Thompson. In particular, he argues he did not know physical injury would eventuate from the strike.

{¶14} A person acts "knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "The legal concept of 'knowingly' incorporates the scienter requirement that one ought to know one's actions will 'probably cause certain results.'" (Citation omitted.) *State v. Barker*, 11th Dist. Portage No. 2010-P-0044, 2012-Ohio-522, ¶114. "[T]he concept of reasonable probability literally embraces the concept of foreseeability." *Id.* In this respect, one cannot punch another in the face without the reasonably foreseeable consequence that one's actions will cause physical or even serious physical harm.

{¶15} Further, "[t]o act knowingly, a defendant merely has to be aware that the result may occur, and it is not necessary to demonstrate that the defendant intended to cause physical injuries." *State v. Ford*, 12th Dist. Butler No. CA2009-01-039, 2009-Ohio-6046, ¶49, citing *State v. Nutekpor,* 6th Dist. Wood No. WD-05-062, 2006-Ohio-4641, ¶15; *see, also, State v. Hawkins,* 2d Dist. Montgomery No. 21691, 2007-Ohio-2979,

5

¶31.    The probable consequence of swinging a fist at a person's face is that the person struck will sustain physical harm, and perhaps serious physical harm. *State v. Buchar*, 5th Dist. Tuscarawas No. 2017AP010003, 2017-Ohio-7601, ¶24. *See also In re R.A.M.,* 11th Dist. Lake No. 2010-L-011, 2010-Ohio-4198, ¶6 ("[S]winging an object toward a person is likely to cause the object to come into contact with the person."). To that end, courts have recognized that the act of "'punching someone' is sufficient to establish the element of 'knowingly'" for purposes of the assault statutes. (Citations omitted.) *State v. Pigg*, 2d Dist. Montgomery No. 25549, 2013-Ohio-4722, ¶33.

{¶16} The evidence demonstrated appellant entered the apartment and immediately struck Mr. Thompson in the face.  Mr. Thompson described the assault as a "sucker punch," indicating he did not have an opportunity to protect or defend himself. This observation was not contested.  Moreover, Mr. Thompson testified he was interested in dating Ms. Whitaker and had asked her out.  Ms. Whitaker confirmed these points and also disclosed Mr. Thompson's invitation to appellant, her long-term boyfriend.  Although, at the time of the assault, Mr. Thompson stated he was uncertain why appellant struck him, he ultimately concluded jealousy triggered the attack.  Under the circumstances, the jury could reasonably conclude that appellant, in punching Mr. Thompson, "knowingly" attempted to cause a specific result, i.e., physical harm, if not serious physical harm (which, as discussed above, legally occurred). *See, e.g., State v. Buckley*, 11th Dist. Lake No. 2018-L-118, 2019-Ohio-3991, ¶47.  We therefore conclude the state presented sufficient evidence for the jury to conclude appellant acted knowingly.

{¶17}  Appellant's first assignment of error lacks merit.

{¶18}  Appellant's second assignment of error provides:

{¶19} "The trial court committed prejudicial error by overruling defendant-appellant's counsel's challenges for cause of two self-admitted prejudicial jurors at voir dire."

{¶20} "The Sixth Amendment to the United States Constitution guarantees a defendant the right to a trial by fair and impartial jurors." *State v. Oliver*, 11th Dist. Portage No. 2010-P-0017, 2012-Ohio-122, ¶37. When counsel challenges a juror for cause, "[t]he ultimate question is whether the 'juror sw[ore] that he could set aside any opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed.'" (Citations omitted). *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶140. "[A] court's determination in a voir dire proceeding of a prospective juror's fairness and impartiality constitutes reversible error only when it can be shown that the court, in conducting the examination, clearly abused its discretion." *State v. Williams*, 6 Ohio St.3d 281, 288 (1983).

{¶21} We first point out that, in this felony case, appellant was entitled to four peremptory challenges, which she exhausted. *See* Crim.R. 24(D). In light of this, appellant argues that the trial court erred in failing to dismiss prospective jurors, Karen Smith and Susan Nickels, for cause. In support, appellant identifies the following exchanges. Ms. Smith stated: "Yeah, I truly believe that there's nothing that can justify an innocent verdict for someone you know did it." Defense counsel asked if anyone else felt the same way as Ms. Smith. Ms. Nickels responded that she did, stating: "If – if I know that that person did what – like sexually or murder, I could not set that person free, I couldn't, why would I want to set a monster out into the community when I knew that they did wrong?" Defense counsel further inquired: "Okay. Even if it meant that the state wasn't able to meet their burden for every element in the offense, but you felt in your heart

7

that that person was guilty but the state wasn't able to prove it?" To which Ms. Nickels responded: "If the person is guilty, I would know. There's – you can sense. It's that sixth sense."

{¶22} The court subsequently engaged the two jurors:

{¶23} THE COURT: Karen Smith. Um, this is not a case involving children and it's not a murder case, correct?

{¶24} KAREN SMITH: Yes

{¶25} THE COURT: Because it's not the two that you seem to have some issues with, can you be fair and impartial to everybody in this case?

{¶26} KAREN SMITH: Yeah.

{¶27} THE COURT: You haven't made up your mind, right?

{¶28} KAREN SMITH: No.

{¶29} THE COURT: 'Cause you don't know anything about the case, right?

{¶30} KAREN SMITH: Exactly.

{¶31} THE COURT: Okay. And then Susan Nickels.

{¶32} SUSAN NICKELS: Yes, sir.

{¶33} THE COURT: You said something about knowing in your heart. You understand we're required to base decisions on evidence, not how we feel in our hearts? Do you understand that?

{¶34} SUSAN NICKELS: Yes.

{¶35} THE COURT: And you can make a decision based on the evidence?

{¶36} SUSAN NICKELS: Evidence only.

{¶37} The trial court, in denying defense counsel's motion to challenge the jurors for cause, the court stated: "Both jurors indicated they could be fair and impartial. Both

8

jurors recognized this case is not a child abuse case or a murder case. Susan Nickels, emphatically using her arms, said she would make the decisions only on the evidence, and the instructions." Each prospective juror stated that she could render a decision on the evidence, and not preconceptions of guilt. Further, the exchange each prospective juror had with the court indicated that, in this matter, she had no preconceptions and that she could be impartial. In this respect, the trial court did not abuse its discretion in overruling counsel's challenge for cause.

{¶38} Notwithstanding these points, appellant asserts Ms. Nickels' and Ms. Smith's comments contaminated the impartiality of the jurors who sat with them in the pool. We do not agree.

{¶39} Initially, it is unclear how the remarks made by the prospective jurors at issue could have contaminated the entire jury pool. Defense counsel asked whether any other juror shared Ms. Smith's initial statement regarding her potential inability to find a person not guilty if "you know [he or she] did it." Only Ms. Nickels responded in the affirmative and the court proceeded to conduct an inquiry into their potential for bias or lack of impartiality. This directly suggests no other prospective jurors in the pool were negatively influenced by the two identified prospective jurors' statements, let alone shared their views. In this regard, we fail to see how the impartiality of the empaneled jurors who sat in the pool with Ms. Smith and Ms. Nickels was deleteriously impacted.

{¶40} Furthermore, once the jury was selected, there was no motion or argument made by defense counsel that the statements of Ms. Nickels and Ms. Smith somehow endangered the impartiality of the remaining jurors. Because the trial court did not have an opportunity to rule on this argument, it is forfeited on appeal and may be reviewed only for plain error. *See State v. Motley*, 11th Dist. Portage No. 2017-P-0023, 2018-Ohio-

9

3324, ¶23, citing Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶41} Here, appellant cites nothing in the record to demonstrate that Ms. Smith's and Ms. Nickels' remarks biased or prejudiced the empaneled jurors other than the fact that the remarks occurred. Generally, prejudicial effect is not presumed, but must be affirmatively shown of record. See *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001). Appellant has failed to demonstrate prejudice, and we therefore decline to hold the trial court's failure to sua sponte dismiss the jury panel en masse was a manifest miscarriage of justice.

{¶42} Appellant's second assignment of error lacks merit.

{¶43} His third assignment of error provides:

{¶44} "The trial court committed prejudicial error and denied defendant-appellant a fair trial due to the structural errors of proceeding with a jury trial of defendant-appellant under the current pandemic emergency concerns and precautions, and violated his rights to due process under Article I, Section 16 of the Ohio Constitution, and the Sixth and Fourteenth Amendments of the United States Constitution."

{¶45} Under his final assignment of error, appellant contends his right to confrontation was violated when Dr. Haniff was allowed to testify while wearing a mask; he further contends his rights were violated because the jury pool did not represent a fair cross section of the community "due to the pandemic environment." We do not agree.

10

{¶46} First, no objection was leveled regarding Dr. Haniff wearing a mask while testifying and, similarly, no objection was made as to the make-up of the jury. As discussed above, such issues are therefore reviewed for plain error.

{¶47} With respect to Dr. Haniff's donning of a mask, the trial court deferred to his professional judgment. When the doctor stated he preferred to wear a mask, the court permitted him to do so. Appellant contends his confrontation right was violated because he could not fully, physically face Dr. Haniff during cross-examination. Although he does not expressly state how the presentation of the doctor's testimony with a mask on undermined his right to confront him, we can reasonably assume his position is premised upon the jury's inability to see and appreciate the witness' full facial expressions and demeanor. We find appellant's position unpersuasive.

{¶48} The Sixth Amendment's Confrontation Claus provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42 (2004). "The Confrontation Clauses were written into our Constitutions '*to secure for the opponent the opportunity of cross-examination.* The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers' (Emphasis *sic.*)" *State v. Self,* 56 Ohio St.3d 73, 76–77 (1990), citing 5 Wigmore on Evidence 150, Section 1395 (1974).

{¶49} "Literal face-to-face confrontation is not the *sine qua non* of the confrontation right." *Maryland v. Craig*, 497 U.S. 836, 847 (1990). Indeed, "physical confrontation may constitutionally be denied where the denial is necessary to further an

11

important public policy and 'the reliability of the testimony is otherwise assured.'" *Self*, *supra*, quoting *Craig, supra.*

{¶50}　With these points in mind, appellant was not denied his right to physically confront Dr. Haniff.　The doctor was present at trial and testified to Mr. Thompson's condition and his treatment upon arrival in the emergency room.　And, while there may be a fine line, under certain circumstances, between expert and fact witnesses, Dr. Haniff's testimony related to his technical expertise as an emergency room physician and how that expertise was employed when Mr. Thompson was treated for his injuries.　In this respect, it is somewhat difficult to imagine how the jury's inability to view the doctor's nose and mouth would have any impact on its evaluation of the substance of his testimony. The testimony was of a medical nature and was derived, in large part, from the notes that were taken when Mr. Thompson was admitted.　The evidence provided by Dr. Imhoff, therefore, was inherently informational in nature and the presence (or absence) of a mask would not affect the reliability of its substance.

{¶51}　In any event, we fail to see how the Confrontation Clause somehow requires a jury to see a witness' entire face or body.　*See　Morales v. Artuz*, 281 F.3d 55, 56, 60-61 (2d Cir.2002) (finding that permitting a witness to testify while wearing dark sunglasses was not contrary to clearly established federal law because it "resulted in only a minimal impairment of the jurors' opportunity to assess her credibility"); *United States v. de Jesus-Castaneda*, 705 F.3d 1117, 1120-21 (9th Cir.2013) (finding that permitting a confidential informant to testify wearing a wig and fake mustache did not violate the Confrontation Clause).

{¶52}　Demeanor is the language of the entire body.　The jurors were able to observe how Dr. Haniff moved when he answered a question; to observe hesitation(s), if

12

any, in his answers; if he blinked in an unusual way or rolled his eyes. The Confrontation Clause cannot be reasonably construed to afford the right to see a witness' lips move or nose wrinkle any more than it could be understood to guarantee that jurors must observe a witness' bare arms to determine whether he or she had "goosebumps" as the result of a uniquely probative question. Just as proper clothing will cover sweating or other potentially inadvertent physical reactions to effective questioning, masks will invariably cover a witness' nose and mouth. This does not, however, prevent a jury from constructively assessing the credibility of the testimony a witness offers.

{¶53} We recognize that body language and hesitation in testimony are critically important in gleaning whether a witness is lying, hiding information, or being truthful. We decline, however, to conclude that the wearing of a mask, particularly in the case of a physician testifying to his or her assessment and diagnostic methods, would prevent the jury from effectively adjudicating the witness' credibility. The jurors were able to physically see the doctor's body language, albeit not his nose and mouth, as well as hear the testimony. Because counsel was able to cross-examine the doctor and the testimony was understood, despite his mask, we hold appellant did not suffer a deprivation of his right to Confrontation.

{¶54} Next, appellant asserts that, owing to the COVID-19 pandemic, the jury which was empaneled did not represent a fair, cross section of the community. Appellant alleges the jury pool consisted of "far-too-many" victims of crime, retired-law enforcement or corrections personnel, and individuals related to or acquainted with law enforcement officials.

{¶55} Selecting a jury from a representative cross-section of the community is an important element of the Sixth Amendment right to jury trial. *Taylor v. Louisiana*, 419 U.S.

13

522, 528 (1975). The Sixth Amendment does not, however, require that juries "mirror the community and reflect the various distinctive groups in the population." *Id.* at 538. It does demand, though, that the "jury wheels, pools of names, panels or venires from which the juries are drawn must not systematically exclude distinctive groups in the community." *Id.*

{¶56} In *Duren v. Missouri*, 439 U.S. 357 (1979), the United States Supreme Court held that to establish a prima facie violation of the cross-section requirement, a defendant must demonstrate "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364. If there is a prima facie showing, the state bears the burden of "justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id.* at 368.

{¶57} Appellant fails to meet the first prong of the *Duren* analysis. To wit, he claims that the venire "did not consist of even one of Defendant-Appellant's peers." He fails, however, to elucidate what his peer group constitutes and therefore cannot establish the alleged unrepresented class of individuals is "distinctive." Further, even if the jury pool was made up of "far-too-many" people whose experiences, occupations, or personal acquaintanceships might suggest a potential bias toward him, his failure to set forth the group which he maintains was unrepresented makes it impossible to evaluate the second prong. And, regardless of this point, a review of the voir dire demonstrates that the jurors selected stated they could be fair and impartial and adjudicate the matter on the evidence. In this regard, his allegation regarding the panel members' background cannot engender prejudice. In light of these points, we conclude that appellant failed to set forth a prima

14

facie case that the pandemic undermined his right to a jury from a fair cross-section of the community. *See State v. Freeman*, 2d Dist. Montgomery No. 2020-CA-33, 2021-Ohio-734, ¶19. (holding that the exclusion of persons 65 years an older from the jury pool due to the pandemic was not, given the evidence, a distinctive group and thus the defendant suffered no prejudice).

{¶58} Appellant's final assignment of error lacks merit.

{¶59} For the reasons discussed in this opinion, the judgment of the Ashtabula County Court of Common Pleas is affirmed.

THOMAS R. WRIGHT, J.,

MATT LYNCH, J.,

concur.

Case No. 2020-A-0054