**[Cite as *State v. Murray*, 2025-Ohio-1485.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 30254 |
| v. | : | Trial Court Case No. 2023 CR 02302 |
| ANTONIO MARVIN MURRAY | : | (Criminal Appeal from Common Pleas Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 25, 2025

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Antonio Marvin Murray appeals from his conviction for murder following a bench trial in the Montgomery County Court of Common Pleas. For the following reasons, we will affirm in part and reverse in part the judgment of the trial court, and we will remand the cause for the trial court to impose a concurrent sentence

on the third firearm specification.

I.      Course of Proceedings and Evidence Presented at Trial

{¶ 2} On August 11, 2023, Murray was indicted by a Montgomery County grand jury on two counts of murder, two counts of felonious assault, and three counts of weapons while under disability.   The murder and felonious assault counts all carried three-year firearm specifications.   The charges resulted from Murray's shooting and killing R.B. in the early morning of August 1, 2023.

{¶ 3} A bench trial was held in April 2024.   Eleven witnesses testified at the trial. Nyjia Brown Simmons testified first.   At the time R.B. was killed, Simmons had been dating him since February 2021.   On the night of July 31, 2023, R.B. dropped Simmons off at a shelter on Apple Street near downtown Dayton.   He was driving his blue van. After R.B. dropped her off, Simmons went inside the shelter but did not check in.   Rather, she left the shelter and started walking on South Main Street toward downtown Dayton. She spoke to R.B. on the phone shortly after she left the shelter and let him know that she had decided to no longer date him because he was physically and emotionally abusive.

{¶ 4} While Simmons was walking north on South Main Street toward downtown, Murray approached her and began talking to her.   She responded that she just got out of an abusive relationship and did not want to be bothered.   According to Simmons, Murray kept following her and talking to her.   She did not give him any details about the abusive relationship with R.B.   However, Simmons also testified that she may have been

talking aloud during some of the walk about how she had been abused and her abuser would not leave her alone. Simmons attributed this to the fact she used to be on medication for schizophrenia.

{¶ 5} Shortly after Murray approached her, a blue van driven by R.B. arrived where they were walking. R.B. parked the van and began talking to Simmons. Referring to Murray, R.B. yelled to Simmons: "Well, are you with him now, the thug?" As R.B. approached Simmons, Murray warned him that if he put Simmons in the van, Murray would call the police and tell them that R.B. had kidnapped her. R.B. told Murray to go ahead and do that and walked up to Simmons and tried to grab her arm to walk her back to the van. According to Simmons, R.B. did not grab her by the neck or the hair, he did not threaten her at that moment, and she was not afraid of him when he approached her. Rather, Simmons planned to walk back to the van with R.B. to avoid a confrontation. Before R.B. was able to grab her arm, Murray pulled out a gun and shot R.B. When Simmons saw the gun, she began running.

{¶ 6} After Murray shot R.B., Simmons witnessed him going through R.B.'s pockets. Murray then tried to hand something to Simmons, but she did not see what it was.

{¶ 7} Detective Zachary Farkas testified next at the trial. He was a homicide detective with the Dayton Police Department. He spoke with two witnesses about R.B.'s shooting. One of the witnesses he spoke with was Caden Laing, who told Detective Farkas that he was too far away to identify people and see what exactly had happened during the shooting. According to Detective Farkas, Laing stated that there were trees

blocking his view during the shooting. Detective Farkas assisted in collecting video footage from cameras near the shooting. He explained that the video evidence showed Murray straddling R.B. after R.B. fell to the ground as a result of the gunshot.

{¶ 8} Police Officer Kenneth Webster also testified. At the time of the trial, he had worked for the Dayton Police Department for five years. He was in the area of the shooting when it occurred. Immediately before the shooting, he ran the license plates on R.B.'s van through his cruiser's computer system. When he heard the gunshot, he did a U-turn and saw several individuals fleeing the scene. He stopped Murray and patted him down but did not locate a gun on Murray. Officer Webster was unaware at the time that Murray had been carrying a bag that he put down on the ground before Officer Webster briefly detained him. Murray did not inform Officer Webster that he had been involved in the shooting or that the shooting had been a result of defending Simmons. Officer Webster allowed Murray to leave and then proceeded to check on R.B. and Simmons. He received from Simmons a brief description of the shooter. Officer Webster did not locate a gun on R.B. but did locate R.B.'s wallet.

{¶ 9} Sergeant Richard Taylor of the Dayton Police Department testified that he assisted in determining what cameras in the area were online during the shooting. As he watched a video from the shooting, Sergeant Taylor identified Murray as the individual in the ball cap.

{¶ 10} Dayton Police Officer Natalie Flory also testified at trial. She was an evidence technician who took photographs of crime scenes and collected evidence. A 9 mm Luger Blazer casing was recovered at the crime scene as well as the keys to R.B.'s

van, his hat, and his cell phone. No firearms were discovered in R.B.'s van.

{¶ 11} Dayton Police Officer Madeline Ambrose testified that she was patrolling the East Side of Dayton on the morning of the shooting and was called to the scene of the shooting to assist other officers. She located a single shell casing at the crime scene.

{¶ 12} Dr. Susan Brown, a forensic pathologist in the Montgomery County Coroner's Office, also testified at the bench trial. She took photos of R.B. There were no signs of struggle. The cause of R.B.'s death was a single gunshot wound to the chest.

{¶ 13} Detective David Posma with the Montgomery County Sheriff's Office testified that he spoke with one witness at the scene, but the witness's information turned out to be inaccurate. When he reviewed some of the video footage near the crime scene, the way Murray walked caught his attention. He later located Murray walking South on Riverside near Parkwood Avenue. He was wearing the same hat as the one he was wearing in the video that captured the area near the crime scene.

{¶ 14} Detective David House testified as the last witness for the State. At the time of the trial, he had been with the Dayton Police Department for a total of 32 years. He interviewed Simmons after R.B. was shot and later interviewed Murray. According to Detective House, Murray initially claimed he had nothing to do with the shooting and told several lies in response to questioning.

{¶ 15} Caden Laing testified as the first witness for the defense. He lived close to where R.B. was killed. Laing testified that he saw R.B. grab Simmons by the arm, yank her around, threaten her, and call her several slurs. He heard Murray warn R.B. several times before Murray shot R.B. Laing testified that he was upset with the police officers

who questioned him, because they forced him into a police cruiser and hurt his back. According to Laing, "I wanted those pigs off of me." Trial Tr. 326. Laing stated that he had not told any police officer that trees prevented him from seeing what happened. Rather, Laing said that he told the police that he had not been able to see what hand movements happened because he was behind Murray at the time of the shooting.

{¶ 16} Murray also testified in his own defense. At the time of the trial, Murray was 44 years old. Murray had been homeless for four years prior to the day he shot the victim. He had never met Simmons prior to the night he approached her on South Main Street. According to Murray, he approached Simmons and asked her for a light, and she responded that she would give him a light if he walked with her. Murray testified that Simmons told him about her boyfriend and the abuse that she suffered at his hands. For example, Murray stated that Simmons explained the victim had been "putting his hands on [her]. That he'd been beating on her. That she'd been trying to get away from him, he won't let her make her own money." *Id.* at 339.

{¶ 17} As they were walking together, Murray mentioned to Simmons that there was a van following them. She got scared and said that R.B. was coming to get her. R.B. got out of his van and started yelling at Simmons. R.B. then approached Simmons and grabbed her by the arm, neck, and hair. According to Murray, R.B. spent a couple of minutes yanking Simmons by the hair, causing her head to move. Murray warned him to stop doing that or he would call the police. Murray testified that he believed R.B. "was either about to kill her, or he was about to hurt this young girl seriously or take her somewhere and kill her." *Id.* at 344. After Murray gave R.B. a fourth and final warning,

he saw R.B. reach toward his pocket, so Murray pulled out a gun from his bag, ran toward R.B., and shot R.B. in the chest. Murray then patted R.B. down and found a gun on him. He tried to hand it to Simmons, but she would not take it. Murray then ran away because he was scared. He testified that he ultimately put the gun "somewhere where could nobody ever find the gun." *Id.* at 349. According to Murray, when he shot R.B., he was "just trying to protect somebody at that time that was in great danger. You know, I was an innocent bystander trying to look out for somebody that was in great danger." *Id.* at 352. He admitted at the trial that he had lied to the police several times while they were questioning him after the shooting. Murray stated that he lied because he panicked and did not trust the police.

{¶ 18} The State also introduced into evidence footage from several video cameras. State's Exhibit 36 contained three different videos showing the area where the shooting occurred. The video supported Simmons's testimony that R.B. did not grab her by the neck and head prior to being shot by Murray. The video evidence did not support Murray's testimony that R.B. was physically yanking Simmons around for a couple of minutes before Murray shot him. Rather, the video evidence showed that only a few seconds elapsed between when R.B. approached Simmons and when Murray shot him.

{¶ 19} The trial court found Murray guilty as charged on all counts in the indictment. On August 6, 2024, the trial court issued a judgment entry in which it found that the first four counts of the indictment (the murders and felonious assaults) merged for purposes of sentencing. The State elected to proceed on count one, murder. The trial court sentenced Murray to 15 years to life in prison and an additional term of three years in

prison on each of the three firearm specifications, which the trial court ran consecutive to each other and the 15 years to life. The court also merged counts five through seven (having weapons under disability) and the State elected to proceed on count seven, having weapons while under disability (prior offense of violence). The trial court sentenced Murray to three years in prison on count seven to be served concurrently with count one, resulting in a total prison sentence of 24 years to life.

**{¶ 20}** Murray filed a timely notice of appeal from the trial court's judgment.

II.    The State Disproved Beyond a Reasonable Doubt Murray's Claim of Defense
       of Another

**{¶ 21}** Murray's first assignment of error states:

THE STATE DID NOT MEET ITS BURDEN OF DISPROVING BEYOND A REASONABLE DOUBT THAT MURRAY ACTED IN DEFENSE OF ANOTHER.

**{¶ 22}** Murray does not dispute on appeal that he shot and killed R.B. And he does not argue that he was defending himself when he killed R.B. Rather, Murray contends that he shot R.B. while defending Simmons.

**{¶ 23}** R.C. 2901.05(B)(1) governs the burden and degree of proof required for the affirmative defense of defense of another and provides that:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against

another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶ 24}** "Defense of another requires proof of the same elements as self-defense." *State v. Cumberlander*, 2024-Ohio-2431, ¶ 41, fn. 9 (10th Dist.), citing *State v. Moss*, 2006-Ohio-1647, ¶ 14 (2d Dist.). "R.C. 2901.05(B)(1) places the initial burden of producing evidence 'that tends to support' a self-defense claim on the defendant." *State v. Bowen*, 2024-Ohio-1079, ¶ 11 (2d Dist.), quoting R.C. 2901.05(B)(1). " '[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.' " *State v. Palmer*, 2024-Ohio-539, ¶ 20, quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 25. "This burden of production is 'not a heavy one and . . . might even be satisfied through the state's own evidence.' " *Id.*, quoting *Messenger* at ¶ 22.

**{¶ 25}** Once the defendant puts forth sufficient evidence that he was acting in self-defense, the burden then shifts to the State to prove that the defendant did not act in self-defense. *Bowen* at ¶ 12, citing *Messenger* at ¶ 19. "To accomplish this, the State must disprove beyond a reasonable doubt at least one of the elements of self-defense." *Id.*, citing *State v. Gutierrez-Reynoso*, 2023-Ohio-3122, ¶ 72 (11th Dist.).

**{¶ 26}** Where deadly force is used, the elements of a self-defense claim are: " '(1)

that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *Messenger* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Effective April 6, 2021, R.C. 2901.09 was amended to reflect that the "duty to retreat" element is no longer required where the person using force in self-defense or defense of another is in a place in which the person lawfully has a right to be. R.C. 2901.09(B). Furthermore, R.C. 2901.09(C) provides that: "A trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense, defense of another, or defense of that person's residence reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety."

{¶ 27} The State's burden "of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal." *Messenger* at ¶ 27. When conducting a manifest weight review, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence

except " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 28} Murray argues that the State failed to carry its burden of disproving any element of Murray's defense of another defense. According to Murray, the evidence established that: (1) R.B. initiated the incident and was the aggressor; (2) Murray believed that R.B. had a gun; (3) Murray was acting in good faith and upon reasonable grounds to believe that Simmons was in imminent danger of death or great bodily harm; and (4) Simmons and Murray were both lawfully walking on the sidewalk and had no duty to retreat. Murray contends that "the greater weight of the evidence demonstrated that the State failed to disprove beyond a reasonable doubt that he acted in defense" of Simmons." Appellant's Brief, p. 15.

{¶ 29} The State concedes that Simmons and Murray were not at fault for creating the situation. However, the State contends that it proved beyond a reasonable doubt that Murray did not have a bona fide belief that he or Simmons was in imminent danger of death or great bodily harm. The State notes that Simmons testified that she was not afraid of R.B. when he approached her shortly before the shooting. Further, Murray's testimony that R.B. grabbed Simmons by her hair and neck and was "yanking her around" for a few minutes was belied by the video evidence submitted at trial. Finally, the State argues that it proved beyond a reasonable doubt that Murray used more force than was necessary to repel the alleged attack. The State points to Simmons's testimony and the video evidence admitted at trial to demonstrate that "[t]he force used by Murray, shooting R.B. was vastly disproportionate to the force R.B. was using on [Simmons], namely

grabbing her arm in an attempt to pull her towards his van." Appellee's Brief, p. 11.

{¶ 30} We will focus on the second element of self-defense since it is dispositive of this appeal. "The second element–whether the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of deadly force–'requires consideration of the force that was used in relation to the danger the accused believed he was in.' " *State v. Rothermel*, 2014-Ohio-3168, ¶ 14 (2d Dist.), quoting *State v. Bayes*, 2000 WL 1879101, *4 (2d Dist. Dec. 29, 2000). The bona-fide-belief element "is a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). As we explained in *State v. Wheatley*, 2000 WL 145394 (2d Dist. Feb. 11, 2000):

> The trier-of-fact "first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, she *reasonably* believed she was in imminent danger." . . . "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that she was in imminent danger." . . . Thus, "self defense 'is placed on the grounds of the *bona fides* of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.' "

(Emphasis in original.) (Citations omitted.) *Id.* at *3, quoting *Thomas* at 331.

{¶ 31} In finding Murray guilty of murder, the trial judge clearly credited the

testimony of the State's witnesses over that of Murray and Laing. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.). "This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Segovia*, 2024-Ohio-1392, ¶ 36 (2d Dist.), citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

**{¶ 32}** Murray testified that he was worried that R.B. would kill Simmons. According to Murray, he knew that R.B. had abused Simmons and he feared that R.B. would either kill her there or take her somewhere and kill her. Murray also testified that he thought R.B. may have been reaching for a gun immediately before Murray pulled out his gun and shot R.B. Murray conceded, however, that he lied several times to police officers after the shooting. Despite having been given multiple opportunities to do so both immediately after the shooting and then hours after the shooting, R.B. did not readily admit that he was the one who shot R.B., let alone that he did it in defense of Simmons.

**{¶ 33}** Murray's testimony was also at odds with other evidence presented at trial. Simmons testified that she was not afraid of R.B. when he approached her, and he did not grab her by the hair or neck. The video evidence contained in State's Exhibit 36 directly contradicted Murray's testimony that he shot R.B. after R.B. had been physically

assaulting Simmons for a couple of minutes. Rather, the video evidence showed Murray shooting R.B. within a few seconds of R.B.'s approaching Simmons and attempting to grab her arm. The video did not support the testimony of Murray or Laing that Murray shot R.B. after R.B. assaulted Simmons several times in front of them. After Murray shot R.B., he fled from the scene, did not call the police, disposed of evidence, and did not turn himself in, further casting doubt on his later claim that he shot R.B. in defense of Simmons.

{¶ 34} The only other testimony supporting Murray's claim that he shot R.B. in defense of Simmons was Laing's testimony. Laing testified that Murray warned R.B. several times while R.B. was physically assaulting Simmons. But Simmons's testimony and the video evidence introduced at trial directly contradicted Laing's testimony. Further, Laing answered multiple questions at trial in such a way that it was clear he had issues with the police officers involved in the investigation of the case and possibly law enforcement in general. His testimony also was contradicted by statements he made to Detective Farkas shortly after the shooting. Therefore, it is not surprising that the trial judge did not find credible Laing's trial testimony.

{¶ 35} Whether Murray had reasonable grounds to believe and did in fact believe that Simmons was in imminent danger of death or serious physical harm under the facts presented in this case was for the factfinder to determine. The trial judge credited the testimony of the State's witnesses over Murray's, and we defer to his credibility assessment. The judge considered all the evidence and ultimately found the State's version of events more credible, thereby rejecting Murray's claim of defense of another.

As the trial judge noted, the video evidence was crucial in disproving the second element of Murray's claim that he was defending Simmons from imminent danger of death or great bodily harm. The evidence also showed that the amount of force Murray used on R.B. was greatly disproportionate to the force R.B. used in reaching for Simmons's arm. The video evidence, Simmons's testimony, Murray's lies to the police, and Laing's clear bias against the police all weighed heavily against Murray's defense theory.

{¶ 36} Based on the evidence presented, the trial court did not lose its way and create a manifest miscarriage of justice. To the contrary, the evidence supported beyond a reasonable doubt the trial court's rejection of Murray's defense of another claim. Murray's case is not an exceptional one in which the evidence weighed heavily against his conviction.

{¶ 37} The first assignment of error is overruled.

III. The Trial Court Did Not Err by Convicting Murray of Murder Instead of Voluntary Manslaughter

{¶ 38} Murray's second assignment of error states:

THE TRIAL COURT ERRED BY CONVICTING MURRAY OF MURDER INSTEAD OF VOLUNTARY MANSLAUGHTER.

{¶ 39} Voluntary manslaughter is defined in R.C. 2903.03(A). The statute provides as follows: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the

victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."

{¶ 40} We have recognized that "voluntary manslaughter is an inferior-degree offense to murder." *State v. Dixon*, 2022-Ohio-3157, ¶ 21 (2d Dist.). This is because voluntary manslaughter contains an additional mitigating element of "serious provocation." *Id.*, citing *State v. Rider*, 2022-Ohio-1964, ¶ 39-40 (2d Dist.).

{¶ 41} In *State v. Shane*, 63 Ohio St.3d 630 (1992), the Ohio Supreme Court elaborated on what constitutes "reasonably sufficient" provocation. First, an objective standard must be applied to determine whether the alleged provocation was reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* at 635. If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634-635.

{¶ 42} Normally, voluntary manslaughter is incompatible with a theory of self-defense because self-defense requires proof of fear while voluntary manslaughter requires a showing of a sudden passion or rage. *See State v. Bouie*, 2019-Ohio-4579, ¶ 47 (8th Dist.). Further, "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." (Citations omitted.) *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). A defendant's fear for his own safety or for the safety of others " 'does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute.' " *State v. Estelle*, 2021-Ohio-2636, ¶ 29 (3d Dist.),

quoting *State v. Harris*, 129 Ohio App.3d 527, 535 (10th Dist. 1998).

{¶ 43} Murray contends that "R.B.'s confrontation and assault of [Simmons] sufficiently provoked Murray's sudden and passionate response of firing one shot at R.B., unfortunately causing his death." Appellant's Brief, p. 15. According to Murray, "[t]he incident unfolded in a matter of seconds, which supports a sudden and passionate reaction by Murray, as opposed to a reasoned and composed decision. Murray presented evidence regarding his state of mind to support that he was acting in a fit of passion or rage." *Id.* at 18.

{¶ 44} The State responds that "[a]t no time during the trial did Murray attempt to argue for voluntary manslaughter, or any lesser included offense." Appellee's Brief, p. 14. Therefore, the State argues that we should review this assignment of error under a plain error standard. Further, the State notes that self-defense and voluntary manslaughter are generally inconsistent with each other. " 'This is so because self-defense is grounded in fear whereas voluntary manslaughter is grounded in a different emotion, a fit of passion or rage.' " *Id.* at 15, quoting *State v. Van Voorhis*, 2024-Ohio-1898, ¶ 36 (2d Dist.). According to the State, although Murray testified that he was afraid of what R.B. might do to Simmons, " 'fear alone is insufficient to demonstrate the emotional states of sudden passion or a fit of rage.' " *Id.*, quoting *State v. Ramey*, 2018-Ohio-3072, ¶ 36 (2d Dist.).

{¶ 45} Contrary to his theory and interpretation of the evidence at trial, Murray argues that the trial court should have convicted him of voluntary manslaughter rather than murder. Murray and his defense counsel maintained throughout the entirety of the

trial that Murray had acted in defense of Simmons and only fired the fatal gunshot because he feared imminent death or great bodily harm to Simmons. At no point during the trial did the defense argue or introduce evidence to insinuate that Murray acted under the influence of sudden passion or a sudden fit of rage. And Murray's own testimony did not support such an insinuation. Rather, Murray testified that he was in fear of Simmons losing her life, so he shot R.B. to protect Simmons. Therefore, we cannot conclude that the trial court erred by convicting Murray of murder rather than voluntary manslaughter.

{¶ 46} The second assignment of error is overruled.


IV.     The Trial Court Did Not Commit Plain Error by Permitting A Witness to Testify While Wearing a Mask

{¶ 47} Murray's final assignment of error states:

THE TRIAL COURT ERRED IN PERMITTING NYJIA BROWN SIMMONS TO TESTIFY WHILE WEARING A MASK.

{¶ 48} According to Murray, the trial court "violated Murray's right to confront the witnesses against him by permitting [Simmons] to testify, while wearing a mask." Appellant's Brief, p. 20. While Murray concedes that Simmons gave her testimony under oath and his counsel had the opportunity to cross-examine her, he contends that he and his counsel were unable to observe Simmons's demeanor during her testimony since she had her mask on while she testified. According to Murray, this was "critical" because Simmons "was combative." *Id.* at 21. Murray continues, "Worse, her mask made it unlikely that her demeanor during the outburst could be evaluated adequately by the trial

court." *Id.* at 22-23.

{¶ 49} The State responds that no objection was made at trial to Simmons's wearing a mask while she testified and, therefore, our review on appeal is limited to plain error. The State contends that " '[l]iteral face-to-face confrontation is not the sine qua non of the confrontation right.' " Appellee's Brief, p. 17, quoting *Maryland v. Craig*, 497 U.S. 836, 847 (1990). According to the State, Simmons was in the courtroom and testified under oath within full view of the trial court and responded to questions from both the State and the defense. Although the trial court could not see all of Simmons's face, "it was able to see her entire body language and hear her voice and any inflections or emotions that may have been present in her testimony." *Id.* The State also cites *State v. Hadlock*, 2021-Ohio-3176 (11th Dist.), which rejected a similar argument as that made by Murray when a witness wore a mask while testifying during the Covid-19 pandemic. The State concludes that Simmons has failed to establish plain error in the trial court's decision to allow Simmons to testify while wearing a mask.

{¶ 50} Murray concedes that neither he nor his counsel raised before the trial court any issue relating to the fact that Simmons testified while wearing a mask. By failing to object during the trial and not giving the trial court an opportunity to rule on this argument, it is forfeited on appeal and may be reviewed only for plain error. *See, e.g., State v. Terrel*, 2015-Ohio-4201, ¶ 19 (2d Dist.). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 51} "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Crawford v. Washington*, 541 U.S. 36, 42 (2004), quoting U.S. Const. amend. VI. "The Confrontation Clauses were written into our Constitutions '*to secure for the opponent the opportunity of cross-examination*. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' " (Emphasis in original.) *State v. Self*, 56 Ohio St.3d 73, 76 (1990), citing 5 Wigmore, *Evidence*, § 1395, at 150 (Chadbourn Rev. 1974). Literal face-to-face confrontation "is not the sine qua non of the confrontation right." *Craig* at 847.

{¶ 52} The Eleventh District's decision in *Hadlock*, 2021-Ohio-3176 (11th Dist.), is persuasive authority relating to Murray's third assignment of error. In *Hadlock*, a witness testified while wearing a mask during the Covid-19 pandemic. On appeal, the defendant argued that the trial court's decision to allow the witness to wear a mask while testifying violated the Confrontation Clause. The Eleventh District held that the Confrontation Clause does not require the factfinder to "see a witness' entire face or body." *Id.* at ¶ 51, citing *Morales v. Artuz*, 281 F.3d 55, 56, 60-61 (2d Cir. 2002) (allowing a witness to testify while wearing dark sunglasses), and *United States v. de Jesus-Castaneda*, 705 F.3d 1117, 1120-21 (9th Cir. 2013) (permitting a confidential informant to testify wearing a wig and fake mustache did not violate the Confrontation Clause). Further, the *Hadlock* court rejected the contention that the trier of fact was prevented from observing the demeanor

of the witness simply because he was wearing a mask. As the Eleventh District explained:

> Demeanor is the language of the entire body. The jurors were able to observe how Dr. Haniff moved when he answered a question; to observe hesitation(s), if any, in his answers; if he blinked in an unusual way or rolled his eyes. The Confrontation Clause cannot be reasonably construed to afford the right to see a witness' lips move or nose wrinkle any more than it could be understood to guarantee that jurors must observe a witness' bare arms to determine whether he or she had "goosebumps" as the result of a uniquely probative question. Just as proper clothing will cover sweating or other potentially inadvertent physical reactions to effective questioning, masks will invariably cover a witness' nose and mouth. This does not, however, prevent a jury from constructively assessing the credibility of the testimony a witness offers.

> We recognize that body language and hesitation in testimony are critically important in gleaning whether a witness is lying, hiding information, or being truthful. We decline, however, to conclude that the wearing of a mask, particularly in the case of a physician testifying to his or her assessment and diagnostic methods, would prevent the jury from effectively adjudicating the witness' credibility. The jurors were able to physically see the doctor's body language, albeit not his nose and mouth, as well as hear the testimony. Because counsel was able to cross-examine the doctor and

the testimony was understood, despite his mask, we hold appellant did not suffer a deprivation of his right to Confrontation.

*Id.* at ¶ 52-53.

{¶ 53} Murray has not established that the trial court committed plain error by allowing Simmons to wear a mask while she testified. Murray's counsel was able to confront and cross-examine Simmons at length, which are the primary rights the Confrontation Clause protects. Instead of claiming his counsel was not able to conduct cross-examination, Murray focuses on whether the mask affected the trial judge's ability to observe the demeanor of Simmons. This concern is not born out by the record. Further, if the trial judge felt the need to see Simmons's mouth or nose in order to make a credibility determination, we are confident the judge would have asked her to remove her mask.

{¶ 54} The third assignment of error is overruled.

V. The State Concedes that the Trial Court Erred in Running the Sentence on the Third Firearm Specification Consecutively to Rather than Concurrently with the Other Prison Terms

{¶ 55} During the March 11, 2025 oral argument, this Court inquired whether the sentence imposed on Murray was inconsistent with the Ohio Supreme Court's recent decision in *State v. Beatty*, 2024-Ohio-5684, which was issued after Murray filed his appellate brief in this matter. We subsequently ordered Murray and the State to file supplemental memoranda addressing the *Beatty* decision and whether that decision

affects Murray's sentence and, ultimately, the outcome of this appeal.

{¶ 56} On March 17, 2025, the State filed its supplemental brief in response to our order. Based upon the Ohio Supreme Court's decision in *Beatty*, the State conceded that the trial court's sentence was unlawful. According to the State, the trial court was required to run two firearm specifications consecutively to Murray's 15 years to life prison sentence and run any remaining discretionary firearm specifications concurrently with that prison sentence, which would result in a total sentence of 21 years to life in prison. Therefore, the State requested that we remand the cause for the sole purpose of imposing a sentence in line with the *Beatty* decision. On March 19, 2025, Murray filed his supplemental brief. He agreed with the State that the trial court's judgment should be reversed and remanded for the trial court to run the three-year sentence on the third firearm specification concurrently with all other prison terms.

{¶ 57} In *Beatty*, a jury found the defendant guilty of four counts of felonious assault and four attendant firearm specifications. *Id.* at ¶ 2. The jury also found Beatty guilty of one count of discharging a firearm on or near prohibited premises, along with an attendant firearm specification, and one count of improperly handling firearms in a motor vehicle. At sentencing, the trial court did not impose any prison term for the firearm specification attached to the firearm-discharge offense, but it imposed three-year prison terms for each of the four firearm specifications attached to the felonious-assault offenses. Two of those prison terms were mandatory under R.C. 2929.14(B)(1)(g) and two were imposed at the trial court's discretion, as authorized by R.C. 2929.14(B)(1)(g). The trial court ran all four sentences consecutively, for a total of 12 years. The court

imposed prison terms of four to six years for each of the four felonious-assault offenses, 18 months for the offense of discharging a firearm on or near prohibited premises, and 12 months for the offense of improperly handling firearms in a motor vehicle. The prison terms for Beatty's offenses were ordered to be served concurrently with each other and consecutively to the firearm-specification prison terms, for an aggregate prison term of 16 to 18 years. *Id.* at ¶ 3. The defendant appealed, but the Twelfth District Court of Appeals ultimately affirmed, holding that R.C. 2929.14(B)(1)(g) required the trial court to run all the firearm-specification prison terms consecutively. *Id.* at ¶ 6, citing *State v. Beatty*, 2022-Ohio-3099, ¶ 4 (12th Dist.) (en banc). Beatty appealed and the Ohio Supreme Court accepted jurisdiction.

{¶ 58} After analyzing Ohio sentencing law, the Ohio Supreme Court noted that "the plain language of R.C. 2929.41(A) evinces the General Assembly's intent that all prison terms—including those for firearm specifications—run concurrently unless a specific exception applies within the statutory provisions enumerated in R.C. 2929.41(A)." *Id.* at ¶ 17. The Court found that "[t]he only statutory provision allowing for consecutive prison terms for firearm specifications—R.C. 2929.14(C)(1)(a)—applies to 'mandatory prison term[s]' only, and therefore does not apply to prison terms imposed at the trial court's discretion under R.C. 2929.14(B)(1)(g)." *Id.* at ¶ 26. As a result, the *Beatty* court concluded that "[t]he General Assembly has not given trial courts the power to require that discretionary prison terms for firearm specifications be served consecutively, and therefore, under R.C. 2929.41(A), such prison terms 'shall be served concurrently' with other prison terms." *Id.* at ¶ 27. The Court reversed the judgment of the Twelfth District

and remanded the cause to the trial court with instructions that it amend its sentence to run the two discretionary prison terms imposed for the firearm specifications concurrently with each other and with the other prison terms imposed. *Id.* at ¶ 29.

**{¶ 59}** We agree with the parties that the recent *Beatty* decision applies to the current appeal and requires us to reverse the trial court's judgment with regard to the sentence imposed on Murray, because the trial court ran the sentence on the third firearm specification consecutively to rather than concurrently with the other prison terms. Therefore, we will remand for the trial court to impose a concurrent sentence on the third firearm specification, which will result in a total prison sentence of 21 years to life.

VI.    Conclusion

**{¶ 60}** We will reverse the trial court's judgment in part and remand the cause for the sole purpose of imposing a concurrent sentence on the third firearm specification. The judgment of the trial court will be affirmed in all other respects.

. . . . . . . . . . . . .

TUCKER, J. and HANSEMAN, J., concur.